**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:  Darlene Marie Shagan,

                                              Chapter 7

                                              Case No.  18-19299 (CMG)

       Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

COLLINS, VELLA & CASELLO
Joseph Casello, Esq.
Attorney for Debtor

OFFICE OF THE U.S. TRUSTEE
Lauren Bielskie, Esq.
Attorney for U.S. Trustee

**CHRISTINE M. GRAVELLE, U.S.B.J.**

**INTRODUCTION**

Acting United States Trustee for Region 3, Andrew R. Vara ("UST") moves before the Court to dismiss the Chapter 7 bankruptcy case of Darlene Marie Shagan ("Debtor") on the basis that the totality of the circumstances of Debtor's financial situation constitutes an abuse to the provisions of Chapter 7.  The UST believes that Debtor has enough income to provide a significant return to unsecured creditors, specifically through utilizing retirement loan

repayments towards payments to creditors. After briefing and oral argument, this Court GRANTS the motion to dismiss.

## FACTS

Debtor's Employment and Pension Loans

Debtor has been employed by the City of New York for approximately 30 years, with the current position of "NYC Courts Executive Secretary." She owns a home in which she resides with her 77-year-old mother, who she lists as a dependent. Debtor has earned gross wages over the past four years of $80,574.00 in 2015, $81,380.00 in 2016, $108,502.00 in 2017, and $83,151.36 in 2018. Despite the relatively high income for her household size, Debtor has struggled with debt. Debtor states this is in large part the result of a destructive relationship centered on gambling. Debtor has certified that as of 2017 she no longer gambles.

In the 28 months prior to her bankruptcy filing, in addition to her regular income, Debtor took out three pension loans totaling $50,300.00. Post-petition, she took an additional $4,100.00 pension loan. An initial loan of $7,000.00 was taken on January 19, 2016 with a repayment date of January 16, 2021 and a monthly payment of $132.21. A second loan in the amount of $30,000.00 was taken on February 15, 2017 with a repayment date of February 15, 2022 and a monthly payment of $569.96. A third loan in the amount of $13,300.00 was taken out at some point in 2017. This loan was rolled into the $4,100.00 post-petition loan, resulting in a July 25, 2023 repayment date and a monthly payment of $360.92 (collectively, the "Pension Loans"). The total monthly sum for the payments is $1,063.09 for the $54,400.00 in Pension Loans.

The Pension Loan Guide for the NYC Employees' Retirement System ("NYCERS Loan Guide") states that "[a]s long as you are in pay status, all loans must be repaid through payroll deductions or the entire loan can be paid off in one lump sum." Similarly, the Deferred

Compensation Loan Guide for the New York City Deferred Compensation Plan ("NYCDCP Loan Guide") states that "while you are actively employed, regular loan repayments must be made through payroll deductions."

The default section in the NYCERS Loan Guide enumerates the penalties for default. It states:

> Once your loan goes into default, the possible penalties include:
> - Your ineligibility to take out another loan until you have paid your outstanding loan balance in full
> - Your Non-Performing Loan becomes taxable. NYCERS will report the taxable position of the loan in default for Federal income tax purposes as a taxable deduction . . .
> - Your Non-Performing Loan will no longer be insured against your death and if a beneficiary is due to receive a benefit, the amount of that benefit will be reduced by the amount of the outstanding loan.

The default section of the NYCDCP Loan Guide similarly states:

> The Default Letter is a confirmation to the participant that the Plan Administrator did not receive the past due loan payment(s) to cure the expiration of the Cure Period and therefore the following have taken place:
> - The entire loan, including any accrued interest, is immediately due and payable.
> - The entire amount outstanding (remaining principal and accrued interest) will be reported on Form 1099-R, as a deemed distribution as required by law.
> - The defaulted loan (including unpaid interest accrued after default) is considered outstanding and is applied to determine the available loan amount from all qualified employer plans of the same employer.
> - The participant will be precluded from applying for future loans from his or her 457 or 401(k) account, even if the defaulted loan is fully paid off.

Debtor's Bankruptcy and UST Investigation

Debtor filed a voluntary Chapter 7 bankruptcy on May 8, 2018. Schedule F lists non-priority unsecured claims in the total amount of $53,441.00. All of the claims listed appear to be

credit cards. Her bankruptcy Schedule I lists gross wages of $7,630.00. Schedule I further lists payroll deductions totaling $4,458.00, comprised of $3,930.00 in taxes, Medicare, and social security deductions; $167.00 in voluntary contributions for retirement plans; $324.00 in required repayments of retirement fund loans; and $37.00 in union dues. After the deductions, and with no other income listed, Debtor's combined monthly income is calculated at $3,172.00. Bankruptcy Schedule J lists Debtor's monthly expenses at $3,579.00, resulting in a <u>negative</u> monthly net income of $407.00.

Debtor's Form 122A-1 statement of current monthly income utilizes gross wages of $7,630.00 in calculating an annual income of $91,560.00. The median family income for a two-person household at the time of her filing was $79,363.00. Due to Debtor's annual income exceeding the median family income, Debtor completed the Form 122A-2 means test calculation. The calculations total $9,394.00 in deductions, leading to a <u>negative</u> monthly disposable income figure of $1,764.00, demonstrating an inability to pay creditors. Based upon these calculations, Debtor indicates that there is no presumption of abuse in the filing of a Chapter 7 case.

The UST conducted an investigation of Debtor's financial affairs. Relating to Debtor's income, the UST determined that in the six-month period from February 1, 2018 through July 31, 2018 the Debtor averaged deposits of $3,870.12 monthly into her bank account, an increase of $698.12 over the $3,172.00 in combined monthly income listed on Schedule I of her petition. The UST further learned that the Debtor had obtained federal income tax refunds in the amount of $6,557.00 in 2015, $4,896.00 in 2016, and $5,454.00 in 2017. The 2017 income tax refund equates to approximately $455.00 monthly which, when combined with the $698.12 in excess deposits, provides an additional $1,153.12 in monthly income beyond that which is listed on Debtor's petition and schedules.

Relating to expenses, the UST determined that through August of the 2018 calendar year Debtor's deductions for taxes, Medicare, and social security only comprised 27% of her gross wages, a decrease from the 51% of her gross wages calculated on her bankruptcy Schedule I. When calculating taxes at the lesser rate, the amount of the payroll deduction would decrease from $3,930.00 to $2,060.00, which would increase the amount available for distribution to creditors.

The UST Motion and Debtor Response

Based upon the results of his investigation, the UST filed the present motion to dismiss under Code section 707(b)(3)(B) based upon the totality of the circumstances of the Debtor's financial situation. The motion is premised upon the fact that with $698.12 per month in excess deposits and $455.00 per month from the income tax refund, the <u>negative</u> monthly net income of $407.00 would instead result in a monthly surplus of $746.12, an amount sufficient to provide an almost 84% dividend to unsecured creditors. That amount did not include the overstated amount deducted for taxes.

Debtor, through prior counsel, filed an amended means test calculation and opposition to the UST motion on the basis that no presumption of abuse arose through Debtor's Chapter 7 filing. The amended means test calculation included a pro-rated bonus, which accounted for a portion of the UST's calculation for additional income for the period from February 1 to July 31 in 2018, and also included the pro-rated tax return. Further, the opposition clarified that the higher deductions for taxes, Medicare, and social security in Debtor's Schedule I were the result of the inadvertent addition of union dues and mandatory contributions (including Pension Loan repayments) in the figure.

The UST's reply noted that the means test analysis is separate from the totality of the circumstance's analysis upon which the motion to dismiss is premised. Debtor's opposition failed to address the abusiveness of the filing relating to the totality of the circumstances. In addition, the UST rejected the Debtor's contention that the pension loan repayments constituted "mandatory" contributions, which prevented her from using those funds to pay creditors.

At the initial hearing on the motion, this Court indicated that it would grant the UST motion to dismiss but adjourned the matter to give the Debtor an opportunity to convert to a Chapter 13 proceeding. In the interim, Debtor retained a more experienced bankruptcy practitioner, who was permitted to file a supplemental response to the UST motion. The supplemental response appended unfiled amended Schedules I & J ("Amended I" and "Amended J"). Amended I listed Debtor's gross wages at $6,857.91, down from the $7,630.00 listed on the filed schedule. It also more accurately reflects the breakdown of Debtor's payroll deductions. The deduction for taxes, Medicare, and social security is listed at $1,857.59, or 27% of the gross wages. It further lists $131.52 in voluntary contributions for retirement plans, $360.92 in required repayments of retirement fund loans, $78.87 in union dues, $702.17 in "TDA savings loans,"[1] and $368.33 for a commuter card. The deductions total $3,499.40, and no other income is listed, leaving Debtor with $3,358.51 in combined monthly income, an increase from the $3,172.00 listed on the filed schedule accompanying the bankruptcy petition.

Amended J lists monthly expenses totaling $3,888.00, an increase of $309.00 over the $3,579.00 expenses listed on the filed Schedule J. The increase in expenses is derived from the addition of $100.00 in home maintenance charges, $30.00 in water and sewer charges, and $279.00 in homeowner's association fees. In subtracting the the new monthly expense figure of

---

[1] The Court is unfamiliar with the reference "TDA savings loans," but based on other information provided by the parties, the Court assumes the reference relates to Pension Loan repayments.

$3,888.00 from new combined monthly income figure of $3,358.51, Debtor calculates her monthly net income as <u>negative</u> in the amount of $529.49, a significant increase in the shortfall calculated from her original petition and schedules.

      Debtor's supplemental response also addressed the UST concerns regarding the income tax refund and additional income. Debtor noted that the income tax refund was due to higher income in 2017 as a result of an unusual amount of overtime that year. Her certification did not explain why she received comparable refunds for the 2015 and 2016 tax years despite lower overall income. Regardless, she noted that the $455.00 per month in additional income which could be attributable to the tax return would still result in a <u>negative</u> monthly net income of $74.49. Finally, Debtor notes that the Pension Loans are deducted directly from her salary, and that she is unable to stop the payments short of quitting or being fired from her job.

      Additional briefing was submitted which primarily addressed the effect of the Pension Loans and the related repayments upon the totality of the circumstances analysis. Oral argument was held on February 19, 2019, at which point the Court directed Debtor to file a supplemental certification to provide information regarding her 2018 tax return, the excess deposits made to her bank account in June 2018, and the reason for the post-petition pension loan taken in August 2018. Debtor's certification stated that she received total state and federal tax refunds of $4,544.00 for the 2018 tax year. She further clarified that the excess income in June 2018 was primarily from a one-time work bonus of $2,831.00, along with a $225.00 promotional credit from her bank. Finally, Debtor stated that the $4,100.00 pension loan was for the purpose of paying ordinary bills and expenses as the result of increased medical expenses from an injury that she suffered in January 2018. The Court reserved its decision on the matter.

## **LEGAL ANALYSIS**

Legal Standard

A court may dismiss a case filed by an individual debtor under Chapter 7 whose debts are primarily consumer debts, "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BABCPA") amended section 707(b) by replacing the standard for dismissal of "substantial abuse" with mere "abuse," thereby making the standard for dismissal less stringent. *See* In re Zuccarell, 373 B.R. 508, 509 (Bankr. N.D. Ohio 2007).

There are two methods for determining whether a case is abusive. Under 11 U.S.C. § 707(b)(2), a case is determined to be presumptively abusive or not abusive based upon a means test calculation of disposable income. Alternatively, when a presumption of abuse does not arise or is rebutted under section 707(b)(2), 11 U.S.C. § 707(b)(3) allows a court to consider two additional separate circumstances in determining whether a filing is abusive. First, the court may consider "whether the debtor filed the petition in bad faith." 11 U.S.C. § 707(b)(3)(A). Second, a court may consider whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(B). Through BABCPA Congress bifurcated the totality of the circumstances test into the independent subsections of section 707(b)(3)(A) and (B), and thus, "bad faith and totality of the circumstances are separate, distinct bases for a finding of abuse under § 707(b)." In re Citta, 2012 WL 6624690 at *3 (D.N.J. Dec. 19, 2012) (internal quotations omitted).

In an analysis of the totality of the circumstances of the debtor's financial situation under section 707(b)(3)(B), the focus is on a debtor's income, assets, expenses, and liabilities, not on non-economic factors. *See, e.g.*, In re Parada, 391 B.R. 492, 499 (Bankr. S.D. Fla. 2008); In re

Haar, 373 B.R. 493, 500 (Bankr. N.D. Ohio 2007). As a result, although it is not the only criterion, the debtor's ability to pay debts is the "primary determinant for demonstrating abuse" under section 707(b)(3)(B). In re Cardona-Pereira, 2010 WL 500404 at *5 (Bankr. D.N.J. Feb. 4, 2010), *citing* In re Lenton, 358 B.R. 651, 662-64 (Bankr. E.D. Pa. 2006) and In re Pennington, 348 B.R. 647, 649 (Bankr. D. Del. 2006). "In determining a debtor's ability to pay, a court may consider a debtor's actual and anticipated financial ability to repay creditors during a hypothetical Chapter 13 commitment period." In re Cardona-Pereira, 2010 WL 500404 at *5 (internal quotation omitted). The debtor's financial condition is to be considered at the time of the motion, which necessarily includes all post-petition events. Id.

Here, though the UST is proceeding primarily under the totality of the circumstances of Debtor's financial condition under section 707(b)(3)(B), a footnote to the memorandum of law in support of the motion opines that if the Means Test had been properly prepared the case would be presumptively abusive, and dismissal under section 707(b)(2) would be appropriate. The UST does not raise any issue as to the bad faith of the debtor under section 707(b)(3)(A). His motion requests dismissal on the proposition that the Debtor has the ability pay her creditors but for her substantial monthly Pension Loan repayments.

Significant caselaw has developed with regard to the appropriate consideration of retirement loans in the context of a bankruptcy abuse analysis. Pre-BABCPA the Third Circuit, interpreting 11 U.S.C. § 1325(b)(1) relating to "projected disposable income" *vis a vis* retirement loan repayments, held that the repayment of amounts withdrawn from retirement accounts is not reasonably necessary for a debtor's maintenance or support on the basis that such payments are contributions to the debtor's own retirement account, and therefore principally benefit the debtor. *See* In re Anes, 195 F.3d 177, 180-81 (3d Cir. 1999). In this district one court found that

"required repayments of retirement fund loans" are only deemed to be mandatory where failure to pay would result in termination of employment. In re Citta, 2012 WL 6624690 at *5 and n. 11.

After the In re Anes decision, Congress amended the Code in 2005 ("BABCPA") and added certain protections for debtors' contributions to retirement accounts and repayment of loans made from those retirement accounts. In particular, Congress added 11 U.S.C. § 1322(f), which provides that "[a] plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325." 11 U.S.C. § 362(b)(19), in turn, relates to retirement loans. Congress additionally added subsection (b)(7) to 11 U.S.C. § 541, which excluded contributions to a qualified retirement account from the definition of "property of the estate." These provisions further strengthened the long-standing Congressional intent to protect retirement accounts from the claims of creditors. See Velis v. Kardanis, 949 F.2d 78, 82 (3d Cir. 1991); In re Yuhas, 104 F.3d 612 (3d Cir. 1997). Thus, there is an inherent tension between the laudable goal of saving for one's retirement and the idea that voluntary contributions to one's own retirement obligations should not take precedence over repayment of preexisting debts. See In re Woody, 494 F.3d 939, 952 (10th Cir. 2007).

Despite the change of law, post-BABCPA courts have declined to apply retirement loan repayments in Chapter 7 calculations. This is because a retirement loan is, in essence, a debt to oneself, not a "debt" or "claim" as defined by the Code. See In re Egebjerg, 574 F.3d 1045, 1049 (9th Cir 2009). Consequently, pension loan payments cannot be taken as a deduction for purposes of the means test under § 707(b)(2). See id. at 1050. The court in In re Egebjerg

employed a statutory construction analysis to explain the distinction between treatment of pension loan repayments in Chapter 7 and Chapter 13 cases:

> First, we presume that when Congress legislates, it is aware of past judicial interpretations and practices. *See* Dewsnup v. Timm, 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). ("When Congress amends the Bankruptcy laws, it does not write on a clean slate.") (internal quotation marks omitted). "Because overwhelming case law preceding [BAPCPA] held that 401(k) loans were not 'debts' under the Code, and because Congress has not expressly said otherwise, the Court must presume that 'debt' retains its pre–2005 Act meaning." Thompson, 370 B.R. at 771; *see also* In re Mowris, 384 B.R. at 238 ("The overwhelming majority of pre-BAPCPA opinions held that a debtor's obligation to make payments on a loan taken from a qualified retirement account was not a claim or debt under the Code, and the court must assume that Congress was aware of this judicial interpretation when it enacted BAPCPA.").
>
> Second, we also presume that if Congress includes particular language in one section of a statute but omits it in another, Congress acted intentionally in that exclusion. KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 118, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004). Here, in BAPCPA, Congress expressly gave Chapter 13 debtors the ability to deduct 401(k) payments from their disposable income calculation, § 1322(f), but did not include any similar exemption for Chapter 7 debtors. Congress also added a section which provides that the automatic stay does not apply to automatic deductions to repay a retirement plan loan, but expressly stated that the provision shall not be construed to provide that such a loan constitutes a "claim" or "debt." § 362(b)(19). "In light of the amendments sprinkled throughout the Code [addressing 401(k) loans]—especially section 1322(f)—the lack of a 401(k) provision in section 707 is a glaring indication that Congress did not intend 401(k) loan repayments to be deducted in Chapter 7." In re Turner, 376 B.R. 370, 376 (Bankr. D.N.H. 2007).

In re Egebjerg, 574 F.3d at 1050. The Egebjerg Court recognized that its analysis promoted inconsistencies between the two chapters but defended it's decision by noting that "[t]he explanation for the lack of such a provision in section 707 is that Congress intended to steer many would-be Chapter 7 debtors toward Chapter 13." Id. It noted that:

> First, 401(k) loan repayments are finite; a loan will eventually be paid off. Second, a Chapter 13 case is prospective, i.e., it encompasses a debtor's current and future financial circumstances for a period of three to five years .... Excluding 401(k) loans from the means test evidences a "wait and see" approach that would channel debtors with such expenses into the longer period of bankruptcy supervision of Chapter 13 rather than the relatively short tenure of a Chapter 7 case, notwithstanding that doing so might result in a zero payment plan. However, because, as here, 401(k) loans might be paid off within the commitment period of a Chapter 13 case, the ability to increase the monthly plan payment would direct newly available funds to creditors. Such an approach serves both the Congressional intent to protect retirement contributions and "ensure that debtors repay creditors the maximum they can afford," a primary goal of BAPCPA.

In re Egebjerg, 574 F.3d at 1050, *quoting* In re Lenton, 358 B.R. 651, 660 (Bankr. E. D. Penn. 2006).

While the In re Egebjerg case relates specifically to the means test analysis of section 707(b)(2), a recent case to examine the issue has similarly found that "the great majority of cases hold that BABCPA did not alter the court's obligation to consider retirement contributions as 'disposable income' when determining the ability to pay under § 707(b)(3)."  In re Smith, 585 B.R. 168, 179 (Bankr. W.D. Ok. 2018);  *see also, e.g.,* In re Tucker, 585 B.R. 168 (Bankr. N.D. Ohio 2008); In re Beckerman, 381 B.R. 841 (Bankr. E.D. Mich. 2008); In re Zaporski, 366 B.R. 758 (Bankr. E.D. Mich. 2007).

This Court agrees with the analysis of In re Egebjerg.  The statutory interpretation set forth by those courts as it relates to the Means Test is logically consonant with the consideration of retirement loans as disposable income in the evaluation of the totality of the circumstances of a debtor's financial situation.  Adopting the position is consistent with the intent of BABCPA, which sought to reform the Bankruptcy Code to shift debtors "into chapter 13 . . . as opposed to

chapter 7" so that debtors "repay creditors the maximum they can afford." H.R. Rep. 109-31 (2005) at *2, *12.

In addition to determining a debtor's ability to pay creditors, courts have employed other factors in reviewing the totality of the circumstances under section 707(b)(3)(B). Recently, a fellow court in this district analyzed the totality of the circumstances test, finding:

> Courts have observed that BAPCPA's substitution of "substantial abuse" with mere "abuse" in section 707(b) results in a less stringent standard. At least one bankruptcy court in this Circuit continues to analyze the totality of circumstances according to nine factors that are "identical" to those previously considered to determine "substantial abuse" under the prior version of section 707(b). These factors are as follows:
>
> > (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5) whether the bankruptcy petition was filed in bad faith; (6) whether the debtor engaged in eve of bankruptcy purchases; (7) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code; and (9) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities.

In re Allocco, 2018 WL 2215966 at *10 (Bankr. D.N.J. May 11, 2018) (citations omitted); *see also*, In re Stewart, 175 F.3d 796, 809-10 (10th Cir. 1999) (setting forth factors for consideration in determining whether the totality of the circumstances demonstrates abuse). The UST has not cited to nor analyzed any additional factors which he feels demonstrates abuse on the part of the Debtor, instead relying primarily on the Debtor's ability to pay her debts. But, application of these factors also support this Court's decision and are referenced herein.

Income and Expenses

      Initially, the original schedules filed by Debtor did not accurately reflect her true financial condition.  Only the UST's investigation brought a more accurate picture to light.  But, this Court finds Debtor's calculation regarding her gross wages found on Amended I to be a reasonable representation of that figure, despite the fact that the Amendment has not been filed as a separate informational document on the docket.  The monthly gross amount of $6,857.91 found on Amended I is consistent with a yearly gross salary of $82,294.92.  While said amount is significantly less than the $108,502.00 in gross wages Debtor earned in 2017, her representation that she worked an unusual amount of overtime that year is consistent with a four-year lookback which shows wages in the low $80,000 range for the years 2015, 2016, and 2018.  The $3,888.00 in expenses found on Amended J are similarly accepted as valid.  The UST did not raise any issue with any specific expenses being overstated or inaccurate.

      Setting aside the issue of the validity of the deductions for the Pension Loan repayments, the Court finds the $3,499.40 in deductions found in Amended I, which includes the Pension Loan repayments, to be an accurate figure on its face. However, the evidence presented demonstrates that Debtor is overwithholding taxes, resulting in a sizeable yearly refund which must be accounted for in determining monthly net income. The Court rejects Debtor's contention that income related to her tax refund should not be calculated.  Debtor relies on her additional income in 2017 to support her position that the $5,454.00 tax refund that year was an outlier. The evidence contradicts that position.  The refunds for the 2015, 2016, and 2018 tax years, during which Debtor had a lower gross income, average almost exactly the amount of the 2017 tax refund.  For this reason, it is appropriate to include an additional $455.00 per month in

income, representing the pro rata monthly portion of the tax refund. This leads to the following calculation for Debtor's monthly net income:

|  |  |  |
|---|---|---|
| Gross Wages: |   | $6,857.91 |
| Tax Refund: | + | $455.00 |
| Deductions: | - | $3,499.40 |
| Expenses | - | $3,888.00 |
| Monthly Net Income | = | (-$74.49) |

Based upon this calculation, this Court concludes that, but for the Pension Loan repayments of over $1,000.00 per month, Debtor is able to make a significant contribution to payment of her debts.

Pension Loan Repayment

The crux of the issue in this case is the treatment of Debtor's $1,063.09 in Pension Loan repayments. Whether analyzed as an improper deduction resulting in an abuse of the means test under section 707(b)(2)(A) or as a consideration in the totality of the circumstances test under section 707(b)(3)(B), the Debtor's case must be dismissed as an abusive filing.

First, this Court agrees with those courts that hold pension loan repayments cannot be deducted in the means test. Therefore, a presumption of abuse arises, which Debtor has failed to rebut. For example, if Debtor had been able to demonstrate a special circumstance, such as a serious medical condition, she may have been able to rebut the presumption of abuse under section 707(b)(2)(B). The Court recognizes that the UST bases his motion to dismiss only tangentially on the means test and, understandably, Debtor's opposition did not directly address any rebuttal of the presumption of abuse. Nothing presented anywhere in the record, even after allowing for the possibility of further development, appears to rise to the level of a special circumstance sufficient to rebut the presumption. Nonetheless, this Court's ruling is not reliant

on section 707(b)(2)(A).  The Means Test is only referenced to the extent it was briefly raised in the UST motion.  Even if Debtor had the opportunity to develop the hardship she may suffer as a result of her failure to pay the Pension Loans, it would not affect this Court's ruling as discussed below.

Here, the Court bases its decision to grant the UST's motion to dismiss on its analysis of the totality of the circumstances.  The paramount consideration in reaching this determination is the Debtor's clear financial ability to repay creditors during a hypothetical Chapter 13 commitment period.  Debtor notes that, as a practical matter, she is not required to apply the funds she uses to pay her pension loans to fund a Chapter 13 plan.  *See* 11 U.S.C. § 1322(f).  She claims that by excluding the income reserved for the Pension Loan repayments, as is allowed in a Chapter 13 case, she demonstrates that she is unable to otherwise fund a plan.  Therefore, dismissal of her Chapter 7 unfairly places her in a position where she is unable to avail herself of the statutory benefits of bankruptcy.

This position fails for two reasons.  First, Debtor's position does not account for the prospective nature of Chapter 13.  Even allowing for full repayment of the Pension Loans, Debtor still has the ability to pay a significant dividend in a Chapter 13 filing.  The Pension Loans all mature prior to the end of a hypothetical 60-month Chapter 13 plan.  If Debtor converted this case to Chapter 13 on or around the time of the original return date, her Chapter 13 plan period would run until approximately January 2024.  Debtor's initial Pension Loan would be repaid in January 2021, leaving 36 months with an additional $132.21 per month in income totaling $4,759.56 in plan payments.  The second Pension Loan would be repaid in February 2022, resulting in 23 months of additional income in the amount of $569.96, for a total of $13,109.08 towards plan payments.  Finally, the last Pension Loan is scheduled to be repaid in

July 2023. Notably, but for the additional post-petition amount, the repayment date would have been sometime in 2022. Even at the later date, there would be 5 months with an additional $360.92 in income resulting in an additional $1,804.60. Combined, this means that over the 5-year Chapter 13 period, a total of $19,673.24 in additional income would be available, an amount representing over 36% of the general unsecured claims.

Second, regardless of the treatment of the Pension Loan repayments, Debtor is eligible to file a Chapter 13. The fact that she may choose not to fund a plan does not make her ineligible. Debtor has not shown that the failure to continue to make the repayments will result in the termination of her employment. The UST notes, and the Court agrees, that such a result would directly contradict the listed NYCERS and NYCDCP Loan Guide defaults, which contemplate "ineligibility to take out another loan until you have paid your outstanding loan balance in full." While the funds would not be required to be used in a Chapter 13, the Debtor may choose to use them with limited adverse effect to her. This is simply another example of the inherent tension between the goals of encouraging and protecting retirement savings and paying creditors. The Court posits that Debtor may be able to propose a Chapter 13 plan that honors both goals, but that is up to Debtor and not the point of this decision.

Debtor's Pension Loan repayments constitute over 15% of her total gross salary. The Pension Loans were taken out within less than two and a half years of the filing of her bankruptcy and totaled $54,400.00. Debtor lists her total unsecured debt at approximately $53,000.00. Had the Pension Loans gone to paying off that debt, Debtor would already be in a de facto bankruptcy where the loan repayments automatically deducted from her paycheck would serve to pay her creditors over the five-year loan period.

Debtor does not indicate that she was forced to file a bankruptcy in May 2018. Her schedules indicate no pending loss or emergency that would prompt a filing. She enjoys steady employment at a significant salary. Her choice to file for relief under Chapter 7 provides her with an opportunity to discharge over $50,000.00 of unsecured debt while allowing her to repay herself over $50,000.00 in pension loans. The Court finds this inherently unjust. The totality of the circumstances based upon these facts require dismissal.

## **CONCLUSION**

This Court finds that, in examining the totality of the circumstances as discussed herein, the grant of relief to Debtor under Chapter 7 would be an abuse of that chapter. The UST's motion to dismiss is granted. The Court will enter an order consistent with this decision which will allow Debtor 30 days to convert her case to a Chapter 13. If there is no conversion, the case will be dismissed.

Dated: May 23, 2019                     */s/Christine M. Gravelle*
                                        United States Bankruptcy Judge